OPINION OF THE COURT
Michael D. Stallman, J.
In this special proceeding, petitioner, the past vice-president of a not-for-profit corporation, seeks to set aside the vote of members that approved amendments to the corporation’s bylaws by a narrow margin, and seeks a preliminary injunction enjoining an election of the corporation’s officers (motion sequence No. 001). Petitioner also seeks leave to conduct discovery of the managing director and bookkeeper of the not-for-profit corporation (motion sequence No. 002). Respondents seek leave to amend their answers to assert additional defenses to the petition, and seek summary judgment in their favor (motion sequence Nos. 003, 004). This decision addresses the petition and all the motions.
Background
Petitioner David Abraham is a member of respondent Diamond Dealers Club, Inc. (DDC). According to petitioner, DDC was founded in 1931 and is a not-for-profit corporation organized under Internal Revenue Code (26 USC) § 501 (c) (6). Petitioner claims that DDC is the largest and oldest diamond-trading bourse in the United States.
It is undisputed that, on November 19, 2008, respondent Jacob Banda, then president of DDC, circulated a letter to members calling for a special meeting on December 4, 2008 at 11:00 a.m., to vote on a series of proposed amendments to DDC’s bylaws. As stated in the notice, the principal effect of one of the amendments was to permit the president of DDC to run for an additional term.[1] By a vote of 353 to 171, the proposed amendments were adopted. Because article XIV of DDC’s bylaws *665 requires amendments to pass by a two-thirds vote of the membership present, the number of votes that exceeded the two-thirds supermajority was apparently narrow. Thus, the vote arguably could have been affected by the voter eligibility issues raised in this petition.
On February 24, 2009 Abraham commenced this special proceeding to declare void the amendments to DDC’s bylaws. Abraham contends that at least four members were not eligible to vote on the amendments to the bylaws, because they had not paid membership dues. In addition, at least three members allegedly received reductions in dues which Abraham contends should not have been granted, and that seven other members received reductions in dues allegedly in exchange for voting in favor of the amendments. Abraham also maintains that one person who voted was not a member of DDC at all.
By order to show cause dated February 25, 2009, Abraham also sought a temporary restraining order barring elections that were scheduled to take place the next day. The court declined to grant the temporary restraining order barring the elections. According to respondents, Abraham ran for but was not elected to the office of vice-president. On March 16, 2009, Abraham brought an order to show cause seeking leave to conduct depositions of DDC’s managing director and bookkeeper (motion sequence No. 002).
On April 2, 2009 the court held a conference to discuss the petition with the parties. The court directed additional briefing on the issues of whether nonpayment of dues or reductions or waivers in dues affect the voting rights of members. Following the additional briefing, respondents wrote to the court contending that Abraham was not a paid member in good standing at the time of the election. The parties agreed to recalendar the petition, so that formal motions could be made. Respondents each moved separately to amend their answers to assert additional defenses, including lack of standing, and moved for summary judgment (motion sequence Nos. 003, 004).
After the petition and motions were submitted, the parties informed the court that, on October 20, 2009, respondent Banda died, triggering a stay of the proceeding. By order dated December 24, 2009, the court recalendared the petition and mo *666 tions, based upon the parties’ stipulation to discontinue the action as against Banda. Notwithstanding Banda’s death, Abraham wished to have the petition determined. The petition and motions were finally submitted on January 7, 2010.
Discussion
Banda’s Motion for Leave to Amend the Answer and for Summary Judgment (Motion Sequence No. 003)
This motion is denied as academic in light of Banda’s death and petitioner’s discontinuance of the petition as against him. DDC’s Motion for Leave to Amend the Answer and for Summary Judgment (Motion Sequence No. 004)
The branch of DDC’s motion for leave to amend the answer is granted, given the absence of surprise or prejudice to Abraham. (Zaid Theatre Corp. v Sona Realty Co., 18 AD3d 352, 355 [1st Dept 2005].) Abraham claims that the additional defenses are baseless, but has not demonstrated that they are plainly lacking in merit so as to warrant denial of leave to amend.
DDC also seeks summary judgment in its favor. However, it is not necessary to move for summary judgment in a special proceeding. Due to the nature of a special proceeding, “the court in which the proceeding is initiated will apply summary judgment analysis . . ..” (Matter of Trustco Bank, N.A. v Strong, 261 AD2d 25, 27 [3d Dept 1999].)
Abraham’s Motion for a Preliminary Injunction and Petition Declaring the Amendments Void (Motion Sequence No. 001)
As a threshold matter, respondents raise the affirmative defense of laches, in that Abraham brought the petition on February 24, 2009, on the eve of DDC’s election. The court rejects the argument of laches, because the petition was commenced within four months of the December 4, 2008 vote.
It is undisputed that the 2006 bylaws of DDC were the bylaws in effect at the time of the vote on the proposed amendments. Abraham argues that the notice of the vote on the proposed amendments to the bylaws violated article Xiy and he contends that numerous members who had failed to pay their dues, or who had received improper or unwarranted reductions in dues, were permitted to vote on December 4.
“A by-law of a corporation has all the force of a statute, and is as binding upon the company and its members as any public law of the state.” (Timolat v S. J. Held Co., 17 Misc 556, 557 [Sup Ct, App Term 1896].) Thus, courts have applied the rules
*667 of statutory construction when interpreting a not-for-profit corporation’s bylaws. (See Fe Bland v Two Trees Mgt. Co., 66 NY2d 556, 564 [1985], citing McKinney’s Cons Laws of NY, Book 1, Statutes §§ 97, 240.)
Article XIV section 1 of the 2006 bylaws provides, in pertinent part, “[t]hese By-laws may be amended, or supplemented by a two-thirds vote of the membership ... at a special meeting called for that purpose, provided the notice for such meeting contains a copy of the proposed amendment or supplementation.” (Emphasis added.) The notice of the special meeting states, in pertinent part,
“The proposed amendments follow:
“1) Article IV Sections 2a, 2b, and 2c shall be deleted and a new section 2a shall provide.” (Verified answer, exhibit B.) Abraham does not argue that the text of section 2a, the proposed amendment, was not included with the notice. Rather, Abraham argues that the text of the deleted sections of article IV should have been included, because Abraham contends that the description of the effect of the proposed amendment was misleading.
This argument lacks merit under the circumstances presented. Article XIV section 1 of the 2006 bylaws requires that the text of a proposed amendment be included with the notice. It does not provide that the text of the current bylaws in effect be reproduced in the notice.
As to the eligibility of members who voted on December 4, 2008, DDC’s managing director, Martin Hochbaum, states that DDC’s records show that approximately 40 members had not paid their 2008 dues prior to February 26, 2009. (Hochbaum aff, Mar. 24, 2009, 1Í 5.)[2] Because the vote approving the amendments passed only by three votes, the eligibility to vote of 40 members who had not paid dues would have affected the outcome of the vote on the proposed amendments.
The 2006 bylaws do not specify any time limits on the duration of a membership, but article IV section 1 does provide for annual membership dues determined by the board of directors. Article VII, section 1 of the bylaws provides that “a member *668 shall be automatically suspended from membership for failure to pay dues. Notice of said automatic suspension shall be mailed to the member and shall be posted in a conspicuous place in the Clubrooms.”
In providing that one’s membership in DDC is suspended for failure to pay annual dues, the 2006 bylaws did not intend that one’s membership in DDC expire after one year, and that payment of dues was required for membership that would commence in the following year. Therefore, it appears that membership in DDC carries no expiration date, but that a member may resign from DDC or may be expelled from DDC, as set forth in DDC’s bylaws. Abraham argues that members who did not pay dues are not entitled to vote because their membership is automatically suspended for failure to pay dues, pursuant to article VII, section 1. DDC argues that members are automatically suspended upon notice to the member of the suspension, citing article IV section 3 of the 2006 bylaws, which states, in pertinent part,
“Sec. 3. FAILURE TO PAY DUES. Members who fail to pay their dues or assessments within the specified time or as set forth by the Board of Directors, shall be notified in writing to pay same. An administration fee determined by the Board of Directors in the sum not less than fifty dollars shall thereupon become due and payable from each member to whom notification is sent.”
The court rejects DDC’s interpretation. The requirement of notice to the member of the failure to pay dues provided in article IV section 3 must be read together with the requirement of a notice of automatic suspension under article VII, section 1. (See Matter of Plato’s Cave Corp. v State Liq. Auth., 68 NY2d 791, 793 [1986]; Matter of Aaron J., 80 NY2d 402, 407 [1992] [the court has the “obligation to harmonize the various provisions of related statutes and to construe them in a way that renders them internally compatible”]; Statutes § 221.) It is reasonable to interpret that the notice to a member of the failure to pay dues is the same notice to the member of his/her automatic suspension due to the failure to pay dues.
To accept DDC’s interpretation runs contrary to the scheme of the bylaws. The bylaws intended that suspension for failure to pay dues be automatic. Automatic suspension treats all members who have not paid dues equally. If suspension were to depend on whether the board of directors sends notice to a *669 member, then the board of directors would have control over whether a member would be suspended, depending on whether it decides to give notice to a particular member. When suspension is contingent upon action by the board of directors, it opens up the possibility that the board of directors could arbitrarily decide when to notify or to refrain from notifying members of their suspension. Thus, the court interprets the 2006 bylaws to impose suspension of membership due to a failure to pay annual dues, which occurs automatically once the deadline to pay annual membership dues has passed.
The bylaws do not specify the effect of suspension of membership on voting rights, but DDC does not argue that the plain meaning of “suspension” means that a member no longer enjoys the rights and privileges of being a member of DDC, which would include the right to vote.
Some members who did not pay their dues in full were granted reductions or waivers in dues, which DDC argues do not affect voting rights, citing article III, section 12b of the 2006 bylaws. Abraham alleges that those members were not eligible to vote because they were not eligible for a reduction or waiver. Article III, section 12b of the 2006 bylaws provides, “Any member to whom a partial reduction of dues has been granted shall not lose his/her voting rights and right to run for any office. Any member to whom a waiver of dues has been granted shall not have the right to run or hold any elective office.” Article III, section 12a provides that the decision to grant a reduction or a waiver of dues is determined by application to a committee “which the Board [of directors] shall appoint for that purpose.” According to respondents, the board created a “Reduction of Dues Committee.” (See Weinstock affirmation 1Í2.)
Article III, section 12b expressly provides that a member whose dues are partially reduced does not lose the right to vote, but does not expressly provide a similar right to vote for a member whose dues were waived. Thus, the implication is that a member whose dues were waived has lost voting rights. (Statutes § 221.)
As to members whose dues were reduced, article VII, section 1 provides that a member “shall automatically be suspended from membership for failure to pay dues.” Once suspended, those members “shall have one year (unless otherwise directed by the Board of Directors) in which to discharge their obligations by payment to the Club, at which time their suspension *670 will be lifted at the discretion of the Board of Directors.” Thus, only the board of directors has the power to lift the automatic suspension of a member who has failed to pay dues.
Although the 2006 bylaws gave the Reduction of Dues Committee the power to grant a reduction in dues, it did not give that committee the power to lift the automatic suspension, which lies only in the discretion of the board of directors. Thus, article III, section 12a cannot be read as granting a member who has been automatically suspended a right to vote, when the dues are subsequently reduced after the member’s suspension. To interpret this provision otherwise would vest the Reduction of Dues Committee with the power to lift a member’s automatic suspension.
However, the analysis does not end there. As DDC indicates, the bylaws must also be read in conjunction with the Not-For-Profit Corporation Law. DDC argues that the automatic suspension provision contravenes N-PCL 507 (c), which states,
“The certificate of incorporation or the by-laws may contain such provisions as are deemed necessary to enforce the collection of fees, dues, assessments, fines or other penalties, including provisions for the termination of membership, upon reasonable notice, for non-payment of such fees, dues, assessments, fines or other penalties, and provisions for reinstatement of membership.” (Emphasis added.)
N-PCL 507 (c) applies to article VII, section 1 of the 2006 bylaws. Although suspension of membership is not listed in the statute, it is similar in consequences to a provision providing for termination of membership, which is specifically mentioned in the statute. Thus, the automatic suspension of membership due to a failure to pay dues must be considered a provision that is deemed necessary to enforce the collection of dues. (Statutes § 237 [“a term of greater comprehension includes a lesser term”].)
The court interprets the phrase “upon reasonable notice” to apply to all provisions that are intended to enforce the collection of fees, dues, assessments, fines or other penalties, and not just to the antecedent immediately preceding it, which refers to the termination of membership. The phrase “upon reasonable notice” precedes the clause “for nonpayment of such fees, dues, assessments, fines or other penalties.” The placement of the phrase supports this interpretation. “[U]pon reasonable notice” precedes the next clause, *671 which mentions all the different kinds of enforcement mechanisms to collect fees. Second, had the Legislature intended “upon reasonable notice” to modify only the termination of membership, it would not have inserted a comma after the phrase, “termination of membership.” Had the statute read “including provisions for termination of membership upon reasonable notice,” then the provision of reasonable notice would clearly have applied only to the termination of membership. Finally, reading a requirement of reasonable notice to apply to all enforcement mechanisms protects a member who has not paid dues from incurring additional fees, dues, assessments, fines or other penalties through inadvertence or forgetfulness, because notice to the member prior to the imposition of those penalties would serve as a reminder to the member.
Thus, N-PCL 507 (c) requires reasonable notice to a member of the failure to pay dues before a member may be suspended due to a failure to pay dues.
“[A] bylaws provision that is inconsistent with the Not-For-Profit Corporation Law is void and unenforceable.” (Sealey v American Socy. of Hypertension, Inc., 10 Misc 3d 572, 574-575 [Sup Ct, NY County 2005]; Wyckoff, Practice Commentaries, McKinney’s Cons Laws of NY, Book 37, N-PCL 602 [“By-laws may not contain a provision which is inconsistent with the N-PCL”].) In light of the court’s construction of N-PCL 507 (c), the court must conclude that the automatic suspension provision set forth in article VII of DDC’s 2006 bylaws cannot be enforced, because it runs contrary to the statute. It is undisputed that no notice was given to DDC members who had not paid dues in 2008. Given the lack of notice, the votes of members who had not paid dues in 2008 cannot be disqualified based solely on the members’ failure to pay dues.
In sum, Abraham has not shown a valid basis for invalidating the vote on December 4, 2008 approving the proposed amendments to DDC’s bylaws.
Given the court’s analysis, respondents’ affirmative defenses of lack of standing (the fourteenth through sixteenth affirmative defenses[3] of the amended verified answer) are unavailing. The eighteenth, nineteenth, twentieth, and twenty-third affir *672 mative defenses are also unavailing. Respondents contend that Abraham had not paid his dues when he brought the petition, and argued that, if the court accepted Abraham’s argument that a member’s rights are suspended automatically for failing to pay dues, then Abraham himself would not have standing to bring the petition, or that the petition should be therefore barred for waiver, estoppel, and unclean hands. The balance of the remaining affirmative defenses raised legal arguments that were either addressed in this decision, or need not be addressed in light of the decision.
Abraham’s Motion for Leave to Take Depositions (Motion Sequence No. 002)
Abraham seeks leave to depose Hochbaum and Rachel Joshua, DDC’s bookkeeper. Abraham believes that Hochbaum has personal knowledge of the allegedly ineligible members who voted on December 4, 2008, and that Hochbaum gave written authorizations to vote to members whom Abraham contends received improper reductions or waivers in dues. Abraham believes that Joshua has knowledge of specific requests for the allegedly improper reductions and waivers in dues.
However, whether the dues of any members were improperly waived or reduced is irrelevant to the outcome of the vote. As discussed above, the court has determined that the member who fails to pay dues is not automatically suspended, because reasonable notice was not given as required under N-PCL 507 (c). It is undisputed that no notices were sent to members until after the vote on the amendments on December 4, 2008. Thus, any members whose dues were not paid in full could not be considered ineligible to vote, based solely on the failure to pay dues in full. Discovery to determine which members received reductions or waivers in dues is therefore irrelevant to whether they were eligible to vote on amendments to the bylaws on December 4, 2008.
Conclusion
Accordingly, it is hereby ordered that respondent Jacob Banda’s motion for leave to amend the answer (motion sequence No. 003) is denied; and it is further ordered that respondent Diamond Dealers Club, Inc.’s motion for leave to amend the answer (motion sequence No. 004) is granted, and the proposed amended verified answer annexed as exhibit B to the moving papers is deemed served; and it is further ordered that petitioner David Abraham’s motion by order to show to cause for a prelim *673 inary injunction (motion sequence No. 001) is denied; and it is further adjudged that the petition is denied and the proceeding is dismissed; and it is further ordered that petitioner’s motion for leave to conduct discovery is denied.

. The amendments also deleted article VI, section 2b, which provided that “[ajnyone having filled the office of President may not run for any office other than Director, Arbitrator or Control Committee without having served at least one term after his/her presidency in one of the above listed offices or having served in no elective office for at least one two year term.” *665 Thus, deleting this amendment effectively permitted the president to run for an elected office immediately after the end of his/her term, without having to wait for two years.

. According to Hochbaum, the board of directors passed a resolution that members who had not paid their 2008 dues “in an acceptable manner on or before February 25, 2009, would be suspended on February 26, 2009.” (Hochbaum aff f 5.) Hochbaum states that the 40 members who had not paid their 2008 dues prior to February 26, 2009 did not vote in the general election on February 26, 2009. (Id.)

. The “Sixteenth Affirmative Defense” appears twice in the amended verified answer, for paragraphs 41 and 42, and for paragraph 43. The court’s ruling applies to both “Sixteenth Affirmative Defense[s].”